Engstrand v. Colvin. Mr. Duncan? May it please the court. Dana Duncan representing Ronald Michael Engstrand. I apologize to the court ahead of time. Allergies, my Mr. Engstrand has a date for an alleged onset of July 1st 2007 and he was at that time 44 years of age. He has a date last insured of September 30th 2008. He suffers from diabetes mellitus and is more importantly from neuropathy. In this case we've limited the case primarily to the one issue and that's Mr. Engstrand's subjective reporting of pain. In this particular case the Commissioner has established a procedure or set of guidelines on how pain is to be assessed. It's a two-step process. The first is is the condition the type that would likely cause pain. If so then you proceed to the second step which is to look at all of the evidence and conjuncture. In this particular case the ALJ specifically seemed to limit her thought process to things such as his gait, his ability to feel a 10 centimeter metal object that's used to test for neuropathy, never taking into account specifics which is that Mr. Engstrand reported severe pain while limited his activities on a consistent basis and that he was on a regular basis lying down with his feet up to avoid the problems or to alleviate the pain noted in his feet. The vocational expert testified at hearing and case law seems to indicate clearly that anybody who has to take a break for any extended period of time and elevate their feet is not employable. In this particular case the ALJ seemed to take into account that factor. We have outlined in detail that neuropathy is not simply an issue of a lack of feeling. Neuropathy can also be severe pain. Mr. Engstrom was on heavy doses of narcotics to help alleviate his pain. He indicated that he had limited his activities. The ALJ found that those however, noting things such as the fact that he took his children out to the to his parents farm where they kept animals for 4-H. Sometimes he would assist his father by turning on machinery that was an automatic feeder that type of thing. This is not the kinds of necessary situations where this is a wide range of activity that would equate to full-time employment. And when he went to the his teenage kids helped him do major work, right? Correct. Major work in the care for their cattle. Yes. In this particular case, Judge, that's exactly the case. He reported the fact that his kids did a lot of the heavier type of activities. I'm first to admit that in many times when you're looking at the scales of justice, the weight of the evidence tipped in favor of a party is a lot of times the volume of evidence in Mr. Engstrom's favor. But what we do have is significant evidence of weight. And that is that he did have this condition, that it does cause pain, that he reported it. At one point in time the state agency doctor himself found that he had some credibility in his reported statements. And I don't think the ALJ did an adequate job of going in and considering that factor when I cited some various cases throughout my brief that indicate that there is a mistaken belief both by courts, by doctors, etc., that individuals who are seeking disability must live a life where they're propped up in front of a television. That's not the case. Depending on age, circumstances, and education, individuals can perform a wide range of activities even in a competitive setting and still qualify for disability. In this particular case, Mr. Engstrom's biggest problem being that it was a condition that required him to take these breaks. That it was a painful condition overall affecting his feet and the ability to stand even for two hours was compromised. That's what would have been I guess the last thing I would like to address briefly is the fact that is the daily activities. He did indicate that he did things such as help his five-year-old dress, get his kids to the bus stop. He did help with some shopping, laundry, and cleaning, but he also reported needing to rest on a daily basis, nap, put his feet up. These are all things that are somewhat inconsistent with the ability to perform on a regular and continuous basis in employment. If there are no questions, I guess at this point in time I would reserve the remaining time I May it please the court, my name is Linda Janicek and I represent the Acting Commissioner of Social Security. As counsel indicated, the sole issue before this court is whether the ALJ adequately supported her determination that Mr. Engstrand's allegations were not completely credible. The ALJ provided specific reasons supported by the record for her finding, and so we ask that this court affirm the District Court's decision that Mr. Engstrand was not disabled. Mr. Engstrand maintains that the ALJ did not consider his reported pain, but that's simply not the case. The ALJ expressly acknowledged that in June and August of 2010, Mr. Engstrand reported foot pain to his doctor. However, the ALJ noted that his doctor attributed his foot pain likely to diabetic neuropathy from his poorly controlled diabetes. Nevertheless, the doctor consistently noted that Mr. Engstrand was still able to perceive a 10-gram filament on both of his feet without difficulty. And additionally, later treatment notes showed an improvement in Mr. Engstrand's blood sugar control once his doctors adjusted his insulin levels and he became more compliant with the recommended treatment. It follows that if his peripheral neuropathy was a result of his poorly controlled diabetes, then once his diabetes was under better control, so too was his peripheral neuropathy. Additionally, the ALJ emphasized the consistently normal examination findings from Mr. Engstrand's doctor. In May of 2009, he had a normal gait, normal station, normal neurological signs, and in June of 2010, he had a normal range of motion with no joint tenderness or swelling and a normal gait. And again, the doctors consistently qualified the probable diagnosis of peripheral neuropathy by noting that Mr. Engstrand could perceive the 10-gram filament on both of his feet. The ALJ also noted that Mr. Engstrand had only mild x-ray findings. In June of 2010, he had x-rays showed only mild arthritis in his right hip and mild arthritis in his right knee. In addition to those objective findings, the ALJ emphasized that Mr. Engstrand was not compliant with his treatment. He didn't refill his medications, he wasn't monitoring his blood sugar levels, and sometimes he sabotaged those blood sugar levels with daytime snacking. But the ALJ emphasized that Mr. Engstrand's levels and compliance with the recommended treatment. The ALJ also considered Mr. Engstrand's considerable activities after his 2007 alleged disability onset date. Now the state agency medical doctor, Dr. Bird, reviewed Engstrand's medical records and pretty much agreed with Rettender's RFC assessment, right? He did. And explained that these conditions he had could be found incredible. And he complained of considerable pain, and this issue of the shoes was to try to relieve that discomfort he felt whenever he stood. You know, the pins or however he described what it made him feel like. And of course that can be taken into account, the pain that the person presents or describes. Right. And Mr. Engstrand, I believe, also testified that, and described that he alleviated some of those sensations when he was walking around his house barefoot. And although the first state agency reviewing physician did agree with Mr. Engstrand's treating physician's opinion, the second state agency reviewing physician, who had the benefit of updated treatment notes, specifically rejected the treating physician's opinion because these later treatment notes showed that his diabetes was under better control, and that his neuropathy had improved also. Going back briefly to Mr. Engstrand's daily activities, significantly in May of 2010, three years after he purportedly became disabled, he reported to his doctors that he was working for five hours a day on his parents farm. And the ALJ also emphasized Mr. Engstrand's function reports, that he drove his wife to work, took care of the dogs, did the shopping, the cooking, the laundry, and the laundry, 80% of the time actually in one function report. Additionally, the regulations instruct an ALJ to consider medical opinions when assessing a claimant's credibility, and the ALJ gave great weight to the state agency reviewing opinion from Dr. Foster, who, as I mentioned, had the benefit of the most recent medical treatment notes, and still opined that Mr. Engstrand could perform a reduced range of medium work. And I would like to note that the jobs identified by the ALJ that Mr. Engstrand could perform were actually at the light and sedentary exertional levels. So even if Mr. Engstrand could stand and walk only for two hours out of the day, he could still perform at work as a ticket taker and a surveillance monitor, which the VE explained existed in significant numbers in Wisconsin. In sum, the ALJ provided numerous reasons, supported by the record, for declining to accept Mr. Engstrand's allegations. Her credibility determination was not patently wrong and should be upheld by the court. If the court has no further questions, we respectfully request that the court affirm the district court's decision. Thank you, Ms. Jossett. Mr. Dunker? Thank you. With all due respect to counsel, neuropathy is a condition that results and is not necessarily reversible. An improvement in one's diabetes does not equate to an improvement in neuropathy. Neuropathy happens and it pretty much stays when you're a diabetic. So this idea that once his diabetes was under control, there was an improvement in his neuropathy is not supported by anything in the record. There's no medical support for it. There's no medical opinion on that. There's no medical evidence that his neuropathy actually proved. Now this tin grain monofilament test that she made reference to, what is that given to determine whether you have neuropathy so severe as to cause an ulcer or gangrene or is it just a general test? It's a test that's done to perform what the level is of the actual, what you can and can't feel with your feet, the numbness. Now there's two aspects with neuropathy. Neuropathy can either result in numbness that you can't feel or it can result in pain. Sometimes they go hand-in-hand, sometimes they're exclusive. In this particular case, our position is that because he, you know, the 10 filament test does not, or the 10 gram filament test does not establish whether he had pain. The fact also that he had a normal gait and station and range of motion also does not establish what the level of his pain was. We had an x-ray and findings on arthritis in his hip or knee does not establish the level of pain that he had in his feet. So this particular test doesn't measure pain? No, it doesn't. It just measures whether you have numbness in your feet. And in this, you know, you have, there's no way to measure pain until such time as we can come up with a machine that the Pain-O-Meter, as I've referred to it on numerous, in numerous briefs, to establish what level of pain someone has. That's why we have these subjective tests that are applied by the commissioner and this method used is to find out if it's painful to you or somebody else. And it's a very subjective situation and you have to look at the total circumstances, what's involved. Furthermore, this idea that he was working five hours a day at his parents' farm, this is not like huge manual labor. I think he described it at one point as he would go out in the fields and drive a tractor for a few hours, but yet he was still lying down. Furthermore, this idea that he could perform sedentary work if he could only stand for two hours a day is is not realistic either. When you're taking breaks, you may be able to stand for two hours a day, but if you're unable to perform it for eight hours, 40 hours a week, that's not sustained employment and you're unable to work it in the definition under the Social Security Act. So all of this combined leads to the to the conclusion that this She made every attempt to come up with some sort of objective measures, but this is something that's subjective in orientation. It cannot be determined the way she did it. If there are no questions, I will relinquish my remaining time. Thank you. Thank you, Mr. Duncan. Case is taken under advisement.